IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

Holly Rice, individually and as parent and )     **CIVIL ACTION NO.:**
natural guardian of N.R., D.W, D.W., K.W., )    2:17-cv-00489-LPL
minor children; Rudolph Smith )
and Yma Smith; Gary J. Kuklish and )     **COMPLAINT – CLASS ACTION**
Kimberly Kuklish; George and Ursula C. )
Markish; and Darrel Redman and Gina )     **DEMAND FOR JURY TRIAL**
Redman, individually and on behalf of all )
others similarly situated, )
                                   )
         *Plaintiffs* )
                                     )
     v.                                   )
                                     )
FIRST ENERGY Corp, )
NRG ENERGY, Inc., and )
MATT CANESTRALE CONTRACTING, )
INC., )
         *Defendants*. )

---

**FIRST AMENDED COMPLAINT**

Plaintiffs, Holly Rice, individually and as parent and natural guardian of N.R., D.W,

D.W., K.W., minor children, Rudolph Smith and Yma Smith, Gary J. Kuklish and Kimberly

Kuklish, George and Ursula C. Markish, and Darrel and Gina Redman, individually and on

behalf of all others similarly situated, by and through their undersigned counsel, alleges the

following:

**INTRODUCTION**

Plaintiffs are owners of private property and/or residents of private property in LaBelle

and Luzerne Townships, Fayette County, Pennsylvania who complain of environmental

contamination and polluting events upon their property and their persons caused by the conduct

and activities of the Defendants herein.  Defendants have caused the dispersion of coal ash and

1

its fugitive dust onto the Plaintiffs and their properties, as well as the surrounding private homes and businesses. Coal ash contains toxic constituents, including but not limited to, heavy metals, including lead, arsenic, cadmium and chromium. Where, as here, Coal ash and its fugitive dust is ingested, inhaled and/or deposited on private property, surface and groundwater; it does great damage to Plaintiffs' health, safety, and welfare. It is injurious to property and unreasonably interferes with the comfortable enjoyment of life and property. Plaintiffs assert claims for personal injury, property damage, trespass, nuisance, and medical monitoring.

## I.     PARTIES, JURISDICTION AND VENUE

### II.a.     PARTIES

#### II.a.i.  Parties - Plaintiffs

1.     Plaintiff Holly Rice, individually and as parent and natural guardian of N.R., D.W., D.W., K.W., minor children, is a citizen of the Commonwealth of Pennsylvania.  She purchased her home at 1112 LaBelle Road, LaBelle PA, 15450.in 2008 and  There from 2008 until the present. Ms. Rice and her children ingested, inhaled, and had direct dermal contact with coal ash, through the air and/or in the surface and subsurface soil and water. This exposure continues to the present day.

2.     Plaintiffs Rudolph Smith and Yma Smith, husband and wife, are citizens of the Commonwealth of Pennsylvania. They  purchased their home at 826 First Street, LaBelle, PA 15450 in 1979, and have lived there from 1979 until the present. The Smiths have ingested, inhaled and had direct dermal contact with coal ash through the air, and/or in the surface and subsurface soil and water. This exposure continues to the present day.

3.     Plaintiffs Gary J. Kuklish and Kimberly Kuklish, husband and wife, are citizens of the Commonwealth of Pennsylvania, and are property owners who reside at 896 Narrows

Road, LaBelle, PA, 15450. This property is Mr. Kuklish's family home and Mrs. Kuklish has resided in the home from 1982 until the present. The Kuklishes have ingested, inhaled and had direct dermal contact with coal ash through the air and/or in the surface and subsurface soil and water. This exposure continues to the present day.

4.      Plaintiffs George Markish and Ursula C. Markish, husband and wife, are citizens of the Commonwealth of Pennsylvania, and property owners who, from 1991 to 2008 resided at 838 First Street, LaBelle, PA, 15450, and who from 2008 to the present reside at 845 First Street, LaBelle PA, 15450. Both properties are owned by the Markishes. The Markishes have ingested, inhaled and had direct dermal contact with coal ash through the air and/or in the surface and subsurface soil and water. This exposure continues to the present day.

5.      Plaintiff Darrel Redman and Gina Redman are citizens of the Commonwealth of Pennsylvania, and property owners who, from 1993 to the present reside at 763 Riverside Drive, LaBelle, PA, 15450. The Redmans have ingested, inhaled and had direct dermal contact with coal ash and/or fly ash through the air and/or in the surface and subsurface soil and water. This exposure continues to the present day.

**II.a.ii. Parties – Defendants**

6.      Defendant, FirstEnergy Corp. is a diversified energy company incorporated in Ohio and headquartered in Akron, Ohio. Its subsidiaries and affiliates are involved in the generation, transmission, and distribution of electricity, as well as energy management and other energy-related services. Its seven electric utility operating companies comprise the nation's fifth largest investor-owned electric system, based on serving 4.5 million customers within a 36,100-square-mile area of Ohio, Pennsylvania, and New Jersey; its generation subsidiaries control more

than 14,000 megawatts of capacity. In 2007, FirstEnergy ranked 212 on the Fortune 500 list of the largest public corporations in America.

7.      First Energy Corp. owns and/or operates the Hatsfield Ferry Power Station and Mitchell Power Station.

8.      First Energy Corp. has disposed of coal ash waste at the LaBelle Refuse Site ("Refuse Site"), located in Luzerne Township, Fayette County, Pennsylvania. The Refuse Site consists of an abandoned coal refuse pile made up of approximately 40 million tons of waste, two coal slurry ponds, and millions of cubic yards of coal combustion waste ("coal ash") piled tens of feet deep on top of the coal refuse, covering a large hill that looms high over the town of LaBelle, Pennsylvania.

9.      Defendant, NRG Energy, Inc., a Delaware corporation based in Princeton, NJ, is a wholesale power generation company with ownership in 47 coal, oil, and natural gas plants worldwide. The company's portfolio of projects totals approximately 22,735 megawatts (MW) in the United States, about half of which is generated in Texas. NRG also has plants in Australia, Europe, and Latin America with a total of about 1,216 MW of generation.

10.     NRG Energy, Inc. owns and/or operates the Elrama Power Plant.

11.     NRG Energy, Inc. disposed of coal ash waste at the Refuse Site.

12.     Defendant, Matt Canestrale Contracting, Inc. is a Pennsylvania corporation owned and operated by Matt and Lorraine Canestrale of Belle Vernon, PA.

13.     Matt Canestrale Contracting, Inc. currently owns and/or operates the Refuse Site.

14.     Matt Canestrale Contracting, Inc. contracted with First Energy and NRG to dispose of coal ash waste at the Refuse Site.

### II.b.  JURISDICTION

15.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Plaintiff classes are citizens of states different from at least some of Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

### II.c.  VENUE

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the events or omissions by Defendants giving rise to the claims asserted herein occurred in this District, have caused harm to Class Members in this District, and Plaintiffs Holly Rice and her minor children, Rudolph Smith and Yma Smith, Gary J. Kuklish and Kimberly Kuklish, George and Ursula C. Markish, and Darrel and Gina Redman reside in this District.

### II.  GENERAL FACTUAL ALLEGATIONS

17.     This matter concerns the LaBelle Refuse Site ("Refuse Site"), located in Luzerne Township, Fayette County, Pennsylvania, which consists of an abandoned coal refuse pile made up of about 40 million tons of waste, two coal slurry ponds, and millions of cubic yards of coal combustion waste ("coal ash") piled tens of feet deep on top of the coal refuse, which, together, form a large mound of material which contains toxic amounts heavy metals and sulfates. The pile covers a large hill that looms high over the town of LaBelle, Pennsylvania. Next to the Refuse Site is a 25.4 acre area which is used as a receiving and staging area for coal ash, which is transported by barge to the Refuse Site. The two areas are permitted separately and divided by state road 4022. This second site is known as the "Prep Plant Site" or "Prep Site" because it was used historically for coal washing and other coal preparation activities.

18.     The Coal Ash is sent by open, uncovered barges to the Prep Site and then by open, uncovered trucks up to the Refuse Site.

19.     The Refuse Site receives approximately 200,000 tons per year of coal ash from coal-fired power plants owned and/or operated by FirstEnergy and NRG Energy in southwest Pennsylvania.

20.     The Refuse Site is unlined, allowing leachate from the site to enter the shallow groundwater, impacting the water quality surrounding the site, causing the groundwater to have high levels of sulfate and high conductivity, which has been shown to be detrimental to aquatic life.[1]

21.     Coal Ash is acidic and contains high levels of toxic heavy metals such as arsenic, boron, lead, selenium, and hexavalent chromium. Water that comes in contact with coal refuse and coal ash waste creates leachate that enters ground or surface waters and threatens the health of local, private, residential communities. It makes groundwater unsafe to drink, pollutes rivers and streams. Leachate from both types of waste continually seeps out from the site and travels onto residential property. The Coal Ash at the Refuse Site was produced at the Hatsfield's Ferry Power Station owned and/or operated by FirstEnergy, the Mitchell Power Station owned and/or operated by FirstEnergy, and the Elrama Power Plant owned and/or operated by GenOn Energy, now NRG Energy.

### III.a.   Background Regarding Coal Ash

22.     Coal ash, also referred to as coal combustion residuals or CCR's, is produced primarily from the burning of coal in coal-fired power plants. Coal ash is generally alkaline and

---

[1] United States Environmental Protection Agency (USEPA). A Field-Based Aquatic Life Benchmark for Conductivity in Central Appalachian Streams. EPA/600/R-10/023F. National Center for Environmental Assessment and Office of Research and Development. March.

contains high levels of toxic heavy metals such as arsenic, boron, lead, selenium, and hexavalent chromium.

23.     Water that comes in contact with coal refuse and coal ash waste creates leachate that enters ground or surface waters threatens the health of local communities, makes groundwater unsafe to drink, harms aquatic and other wildlife, and pollutes rivers and streams.

24.     If ingested or inhaled, these toxicants can cause cancer and nervous system impacts such as cognitive deficits, developmental delays and behavioral problems. They can also cause heart damage, lung disease, respiratory distress, kidney disease, reproductive problems, gastrointestinal illness, birth defects, and impaired bone growth in children.

25.     The Environmental Protection Agency (EPA) has found that living next to a coal ash disposal site can increase the risk of cancer or other diseases.[2]

III.b.   **Site History**

26.     The Vesta Coal Company, a subsidiary of Jones and Laughlin Steel Corporation (J&L Steel), owned coal mines along the Monongahela River at the start of the 20th Century. In 1903 it the Vesta #4 mine was opened, and Vesta #5 mine followed in 1908.  By 1918 these two mines were the first and second, respectively, largest bituminous coal producing mines in the world. All the coal mined at Vesta 4 and 5 was transported across the Monongahela River to the LaBelle Processing Plant.

27.     LaBelle became the largest coal preparation processing plant in the world.[3] It was constructed to serve as the coal preparation plant, "Prep Plant" for the Vesta #4 and #5 underground mining complex across the Monongahela River.

---

[2] U.S. Environmental Protection Agency (EPA), "Human and Ecological Risk Assessment of Coal Combustion Wastes" (draft). (Released as part of a Notice of Data Availability) Aug. 6, 2007.

28.     In the 1940s J&L decided to build a suspension bridge for easier transportation to the LaBelle Prep Plant, creating a coal processing Complex, which was considered the crowning achievement of post-war mining technology. Each day the Prep Plant processed (screened and cleaned) enough coal to fill 21 barges a day bearing 900 tons, for a daily output of 19,000 tons of clean coal  It is estimated that 31.5 million tons of refuse[4] from coal screening and cleaning were dumped behind the LaBelle Prep Plant.

29.     J&L Steel owned the mines and processing plant until the 1960s when it was taken over by LTV Steel. LTV Steel continued to operate the LaBelle plant even after the Vesta Mines were mined out in the late 1970's, processing coal from other local mines, until 1982 when LTV Steel sold the LaBelle site to A.T. Massey Coal Company.

30.     A.T. Massey leased the LaBelle Prep Plant to Interstate Energy Thermal Conversion Corporation ("ITEC"), which began operations in 1986. An affiliate of ITEC, the LaBelle Processing Company, operated the coal refuse disposal area. ITEC and the LaBelle Processing Company ceased operations at the Prep Plant in December 1994 and both filed for bankruptcy.

31.     Prior to MCC taking ownership, the Refuse Site, which contained coal and rock, did not disperse coal ash or fugitive dust on to the surrounding residential community.

32.     In 1995, Matt Canestrale Contracting, Inc. ("MCC") entered into negotiations to purchase ITEC's and LaBelle Processing Company's assets. MCC and the Pennsylvania Department of Environmental Protection then negotiated a Consent Order and Agreement (CO&A). The CO&A was entered into on April 14, 1997 and charges MCC with the reclamation

---

[3] Coal processing includes crushing and screening the coal to reach a uniform size.  Washing includes putting the coal through a liquid medium to remove impurities, rock, clay and other minerals from the coal.

[4]   Coal Refuse is rock and coal.

of the LaBelle Site, outlining the duties and responsibilities of MCC in undertaking this reclamation and eventual abandonment and closing of the LaBelle Site.[5] MCC was to complete the reclamation in about 10-12 years.  It has now been almost 20 years.

33.     Instead of closing and reclaiming and abandoning this site, MCC has been running it as a waste disposal site for Coal Ash ("Refuse Site") since it acquired the site, and plans to do so for an additional ten (10) years after the reclamation is complete.

34.     The Refuse Site is a 506.7 acre site located within a bend of the Monongahela River that surrounds it to the north, east, and west. There are 361.5 acres currently affected, or planned to be affected, by coal refuse disposal activities. MCC also owns and operates a 25.4 acre area adjacent to the Refuse Site, which is used as a receiving and staging area for ash transported by barge en route to the Refuse Site. The two areas are permitted separately and divided by state road 4022. This second site is known as the "Prep Plant Site", because it was used historically for coal washing and other coal preparation activities as described *supra*.

35.     The coal ash that is now at the Refuse Site is the same material that had already contaminated ground and surface waters in Little Blue Run, Beaver County, Pennsylvania. Indeed, FirstEnergy's Little Blue Run coal ash impoundment pond, which received scrubber material and coal combustion byproducts from FirstEnergy's Bruce Mansfield Plant, was shut down under a federal consent order at the end of 2016 in part because seepage of pollutants such as arsenic, sulfates, sodium, calcium, magnesium and chloride from the unlined impoundment contaminated groundwater and surface water.  FirstEnergy was also cited by the Pennsylvania

---

[5]   Pennsylvania created the Bureau of Abandoned Mine Reclamation in accordance with requirements of the 1977 federal Surface Mining Control and Reclamation Act Pursuant to 025 Pa. Code § 90 Reclamation must address protection the hydrological balance, erosion and sedimentation control, air pollution control, fish and wildlife protection and enhancement, stream buffer zones, as well as groundwater and surface water protection.

Department of Environmental Protection (DEP) for failing to acknowledge arsenic contamination of groundwater around the ash impoundment.

### III.c.   Coal Ash Disposal and the Crisis in LaBelle

36.     With Little Blue Run closed, FirstEnergy turned its sights on LaBelle, Pennsylvania, another small unsuspecting rural town an hour's drive south of Pittsburgh on the Monongahela River. The plan: to dispose of the approximately three million tons of toxic scrubber and coal combustion byproducts produced annually at the Bruce Mansfield Plant.

37.     Since MCC ownership of the Refuse Site receives approximately 200,000 tons per year of coal ash from coal-fired power plants in southwest Pennsylvania owned and/or operated by FirstEnergy, NRG Energy and/or their affiliates.

38.     The Refuse Site has been routinely in violation of state laws including the Clean Streams Law, Air Pollution Control Act, and Surface Mining Control and Reclamation Act; as well as federal laws including the Resource Conservation and Recovery Act; and the Clean Air Act.

39.     Defendants FirstEnergy and NRG Energy continued to dispose of the coal ash at the refuse site despite being aware of the routine violations at the site.

40.     Since 1997 the barges hauling coal ash to the terminal are not covered and have permitted the coal ash to blow freely into the surrounding private residential environment and negatively impact the health of both humans and the environment.

41.     Additionally, since 1997 the trucks hauling coal ash waste from the terminal to the Refuse Site are not covered and have permitted the coal ash to blow freely into the surrounding private residential environment and negatively impact the health of both humans and the environment.

42.     The coal ash hauled and then dumped at the Refuse Site since 1997 is not properly contained, and the coal ash has been free to blow and disperse into the surrounding private residential community and properties, and leach into the groundwater on residential properties in and around the Refuse Site.

43.     As a result, these residents have been and continue to be ingesting, inhaling and are experiencing direct dermal contact with coal ash, through the air and/or in the surface and subsurface soil and water.

44.     The health of these residents has been seriously impacted, as have the values of their properties. Those residents wishing to sell their homes to leave this toxic environment are unable reasonably to do so because of the contamination in their land. As described above, the coal ash contains heavy metals such as arsenic, mercury, lead, cadmium, chromium, and selenium that cause cancer, respiratory illnesses, and other health issues.

45.     The heavy metals in coal ash can cause or contribute to many serious health conditions including: skin, eye, nose and throat irritation; asthma; emphysema; hypertension; anemia; heart problems; nervous system damage; brain damage; liver damage; stomach and intestinal ulcers; and many forms of cancer including skin, stomach, lung, urinary tract, and kidney cancers.

### III.     CLASS ACTION ALLEGATIONS

46.     Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

47.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all other persons similarly situated as members of the proposed Subclasses:

**Property Owners Subclass**
Current property owners in Luzerne Township who have owned and/or resided in their current private residence for at least two years.

**Non-property owner Residents Class**
Luzerne Township Residents who have lived in or on private property within the township for at least two years.

48.     Excluded from the classes set forth above are: (a) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (b) the Judge to whom this case is assigned and the Judge's staff; (c) any class counsel or their immediate family members; (d) any State or any of its agencies; (e) Luzerne Township and Fayette County, Pennsylvania; (f) persons who are incarcerated and otherwise do not own or reside in private residential property as identified in the two subclasses and herein; and (g) any individual who otherwise would be included under one or more of the class descriptions above, but who is already a party in a lawsuit for personal injury for a coal ash related illness and/or  who does not own and/or reside in or on private property.

49.     Collectively, the Property Owner and Non-property Owner Subclasses are referred to as the "Subclasses."

50.     The Subclasses and this action satisfy the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

**IV.a.   Class Action Allegations – Numerosity**

51.     The members of the Subclasses are so numerous that joinder of all members is impracticable. The population of Luzerne Township is estimated to include approximately 6,000 current private residents. Plaintiffs believe that Subclass members can be easily identified from public records, such as: property tax records, municipal water records, and employment records.

All such Subclass members may be notified of the pendency of this action by mail or via other public forums.

**IV.b.   Class Action Allegations – Typicality**

52.      Plaintiffs' claims are typical of the claims of the members of the Subclasses inasmuch as all members of the Subclasses are similarly affected by Defendants' misconduct resulting in injury to all members of the Subclasses.

**IV.c.   Class Action Allegations – Adequacy of Representation**

53.      Plaintiffs will fairly and adequately protect the interests of members of the Subclasses and have retained counsel competent and experienced in class action and environmental litigation.

54.      Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Subclasses and have the financial resources to do so.

55.      Neither Plaintiffs nor their counsel has interests adverse to any of the Subclasses.

**IV.d.   Class Action Allegations – Predominance of Common Questions**

56.      Plaintiffs bring this action under Rule 23(b)(3) because numerous questions of law and fact common to class members predominate over any question affecting only individual members. The answers to these common questions will advance resolution of the litigation as to all class members. These common legal and factual issues include:

a.      Whether Defendants owed a duty to Plaintiffs and members of the Subclasses;

b.      Whether Defendants knew or should have known that their coal ash was unreasonably dangerous because it contains toxic constituents, including but not limited to heavy metals lead, arsenic, and cadmium and chromium;

c.      Whether Defendants knew or should have known that their coal ash contained heavy metals and other toxins that would be dispersed onto the surrounding community as it was transported to the Refuse Site via uncovered barges and trucks;

d.      Whether Defendants knew or should have known that the coal ash dumped at the Refuse Site was and is not contained and therefore in the past and continuing to the present coal ash has been and continues to be dispersed on to the surrounding community;

e.      Whether Defendants failed to warn private residents and/or property owners of the potential for harm from the toxic heavy metals and chemicals contained in coal ash;

f.      Whether Defendants became aware of health and environmental harm caused by coal ash and failed to inform members of the Subclasses; and

g.      Whether the members of the Subclasses have sustained damages and the proper measure of damages.

**IV.e.   Class Action Allegations – Superiority**

57.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.

58.     Defendants have acted on grounds generally applicable to the Subclasses, thereby making appropriate final legal and equitable relief with respect to the class as a whole.

59.     Furthermore, as the damages suffered by individual Subclass members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Subclasses to individually redress the wrongs done to them.

60.     Class treatment of common questions of law and fact will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

61.     There will be no difficulty in the management of this action as a class action. Plaintiffs' claims are typical of the claims of the members of the Subclasses inasmuch as all members of the Subclasses are similarly affected by Defendants' misconduct resulting in injury to all members of the Subclasses.

**IV.f.     Rule 23(b)(2) Injunctive Relief**

62.     In addition to the above, Plaintiffs bring this class action under Rule 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Subclasses as a whole, such that final injunctive relief is appropriate with respect to each of the Subclasses as a whole.

63.     Such injunctive relief includes, but is not limited to, an injunction to require the implementation and funding of a blood serum testing program for the Plaintiffs and the Subclasses to test for the presence of heavy metals and hexavalent chromium in their blood serum; and the implementation and funding of a medical monitoring program for the Plaintiffs and the Subclasses sufficient to monitor the Plaintiffs' and Subclasses' health to ensure they are adequately protected from the deleterious effects of heavy metals and other toxic chemicals contained in coal ash.

**IV.g.     Rule 23(c)(4) Certification of Particular Issues**

64.     In the alternative to certification under Rule 23(b)(2) or 23(b)(3), Plaintiffs and the Subclasses seek to maintain a class action with respect to particular issues under Rule 23(c)(4).

65.     The adjudication of each Defendant's liability, jointly and severally, involves issues and questions common to the entire class, such that certification pursuant to Rule 23(c)(4) is appropriate.

## IV.      CAUSES OF ACTION

### V.a.      First Cause of Action – Medical Monitoring Against All Defendants

66.      Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

67.      As a result of the Defendants' negligence, the Plaintiffs and Subclasses have been subjected to exposure greater than normal background levels of toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium.

68.      As a proximate result of their exposure, the Plaintiffs and the Subclasses have a significantly increased risk of contracting a serious latent disease.

69.      A monitoring procedure exists that makes the early detection of such latent diseases possible.

70.      The prescribed monitoring regime for the early detection of latent diseases caused by exposure to toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals, is different from that normally recommended in the absence of the exposure.

71.      The prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

72.      Defendants' acts were willful, wanton or reckless and conducted with a reckless indifference to the rights of Plaintiffs and members of the Subclasses.

### V.b.      Second Cause of Action – Negligence Against FirstEnergy

73.      Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

16

74.   The Defendant had a duty to contain and dispose of coal ash created at the Hatsfield Ferry Power Station and Mitchell Power Station in a safe and appropriate manner.

75.   Defendant knew or should have known that the coal ash contained toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium, that are known to be toxic and hazardous to human health and the environment.

76.   Defendant further knew or should have known that it was unsafe and/or unreasonably dangerous to handle and transport coal ash uncovered, both by truck and by barge, because it was a near certainty that toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium, contained in the coal ash, would become airborne, and be dispersed on to the community.

77.   Defendant knew or should have known that the Refuse Site was unlined and the coal ash was not properly contained to prevent and the coal ash has been free to blow and disperse into the surrounding community and property, and leach into the groundwater on residential properties in and around the Refuse Site unencumbered.

78.   Defendant knew or should have known that the Refuse Site was regularly in violation of environmental laws and regulations.

79.   Defendant knew or should have known that toxic heavy metals, including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium, would become airborne at the Refuse Site and contaminate the environment and pose a threat to human health.

80.   Defendant knew or should have known that toxic heavy metals, including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited

17

to hexavalent chromium, would spread by leach into the groundwater and surface water from the Refuse Site and contaminate the environment and pose a threat to human health.

81.     The Plaintiffs and the Subclasses were foreseeable victims of the harm caused by Defendant's reckless and irresponsible handling, care, and management of the coal ash.

82.     As a result of Defendant's breach of its legal duty, the Plaintiffs and the Subclasses have been and continue to be subjected to coal ash via ingestion, inhalation, and contact with contaminated soil and water, which contain unsafe levels of toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium.

83.     As a result of Defendant's negligent, reckless and/or intentional acts and omissions alleged herein, the Plaintiffs and Subclasses have been exposed to unsafe levels of toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium.

84.     As a result of Defendant's negligent, reckless and/or intentional acts and omissions alleged herein, areas around the Refuse Site and transportation routes where the coal ash has become airborne are contaminated with unsafe levels of toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium.

85.     Defendant's negligent handling, storage, transportation, and oversight of the coal ash created at the Hatsfield Ferry Power Station and Mitchell Power Station caused and is causing unknowing Plaintiffs and Subclass members an increased risk of associated illnesses due to the presence of toxic heavy metals including but not limited to lead, arsenic, and cadmium, as

well as other toxic chemicals including but not limited to hexavalent chromium in their drinking water and in their environment.

86.     Contamination of property has resulted in the diminution of the value of the Property Owner Subclass' properties.

87.     Defendant's acts were willful, wanton or reckless and conducted with a reckless indifference to the rights of Plaintiffs and members of the Subclasses.

88.     As a direct and proximate result of Defendant's actions and omissions, Plaintiffs and the Subclasses have suffered and continue to suffer damages, including medical monitoring damages; monetary damages associated with the investigation, treatment, remediation; property damages, including, without limitation, loss of value, annoyance, disturbance, intrusion, harassment and inconvenience; all for which Plaintiffs and the Subclasses are entitled to recover damages.

**V.c.     Third Cause of Action – Negligence Against NRG Energy**

89.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

90.     The Defendant had a duty to contain and dispose of coal ash created at the Elrama Power Plant in a safe and appropriate manner.

91.     Defendant knew or should have known that the coal ash contained toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium, that are known to be toxic and hazardous to human health and the environment.

92.     Defendant further knew or should have known that it was unsafe and/or unreasonably dangerous to handle and transport coal ash uncovered, both by truck and by barge,

19

because it was a near certainty that toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium, contained in the coal ash, would become airborne, enter and contaminate the environment.

93.     Defendant knew or should have known that the Refuse Site was unlined and the coal ash was not properly contained to prevent and the coal ash has been free to blow and disperse into the surrounding community and property, and leach into the groundwater on residential properties in and around the Refuse Site unencumbered.

94.     Defendant knew or should have known that the Refuse Site was regularly in violation of environmental laws and regulations.

95.     Defendant knew or should have known that toxic heavy metals, including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium, would become airborne at the Refuse Site and contaminate the environment and pose a threat to human health.

96.     Defendant knew or should have known that toxic heavy metals, including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium, would leach into the groundwater and surface water from the Refuse Site and contaminate the environment and pose a threat to human health.

97.     The Plaintiffs and the Subclasses were foreseeable victims of the harm caused by Defendant's reckless and irresponsible handling, care, and management of the coal ash.

98.     As a result of Defendant's breach of its legal duty, the Plaintiffs and the Subclasses have been and continue to be subjected to coal ash via ingestion, inhalation, and contact with contaminated soil and water, which contain unsafe levels of toxic heavy metals

including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium.

99.     As a result of Defendant's negligent, reckless and/or intentional acts and omissions alleged herein, unsafe levels of toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium.

100.     As a result of Defendant's negligent, reckless and/or intentional acts and omissions alleged herein, areas around the Refuse Site and transportation routes where the coal ash has become airborne are contaminated with unsafe levels of toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium.

101.     Defendant's negligent handling, storage, transportation, and oversight of the coal ash created at the Elrama Power Plant caused and is causing unknowing Plaintiffs and Subclass members an increased risk of associated illnesses due to the past and continuing exposure to toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals.

102.     Contamination of Plaintiffs' and the Property Owner Subclass' property has resulted in the diminution of the value of properties.

103.     Defendant's acts were willful, wanton or reckless and conducted with a reckless indifference to the rights of Plaintiffs and members of the Subclasses.

104.     As a direct and proximate result of Defendant's actions and omissions, Plaintiffs and the Subclasses have suffered and continue to suffer damages, including medical monitoring damages; monetary damages associated with the investigation, treatment, remediation, property

damages, including, without limitation, loss of value, annoyance, disturbance, intrusion, harassment and inconvenience; all for which Plaintiffs and the Subclasses are entitled to recover damages.

### V.d.    Fourth Cause of Action – Negligence Against MCC

105.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

106.    The Defendant had a duty to contain and dispose of coal ash at the Refuse Site in a safe and appropriate manner.

107.    The Defendant had a duty to transport coal ash to the Refuse Site in a safe and appropriate manner.

108.    Defendant knew or should have known that the coal ash contained toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium, that are known to be toxic and hazardous to human health and the environment.

109.    Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to handle and transport coal ash uncovered, both by truck and by barge, because it was a near certainty that toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium, contained in the coal ash, would become airborne, and be dispersed on to the community.

110.    Defendants knew or should have known that the Refuse Site was unlined and the coal ash was not properly contained to prevent and the coal ash has been free to blow and disperse into the surrounding community and property, and leach into the groundwater on residential properties in and around the Refuse Site unencumbered.

111.    Defendants knew or should have known that the Refuse Site was regularly in violation of environmental laws and regulations.

112.    Defendants knew or should have known that toxic heavy metals, including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium, would become airborne at the Refuse Site and contaminate the environment and pose a threat to human health.

113.    Defendants knew or should have known that toxic heavy metals, including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium, would spread by leach into the groundwater and surface water from the Refuse Site and contaminate the environment and pose a threat to human health.

114.    The Plaintiffs and the Subclasses were foreseeable victims of the harm caused by Defendant's reckless and irresponsible handling, care, management, and disposal of the coal ash.

115.    As a result of Defendant's breach of its legal duty, Plaintiffs and the Subclasses were exposed to unsafe levels of toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium.

116.    As a result of Defendant's negligent, reckless and/or intentional acts and omissions alleged herein, Plaintiffs and Subclasses were exposed to unsafe levels of toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium.

117.    As a result of Defendant's negligent, reckless and/or intentional acts and omissions alleged herein, areas around the Refuse Site and transportation routes where the coal ash has become airborne are contaminated with unsafe levels of toxic heavy metals including but

not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium.

118.    Defendant's negligent handling, storage, transportation, and oversight of the coal ash caused and is causing unknowing Plaintiffs and Subclass members an increased risk of associated illnesses due to the presence of toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium in their environment.

119.    Contamination of Plaintiffs' and the Property Owner Subclass' property has resulted in the diminution of the value of properties.

120.    Defendant's acts were willful, wanton or reckless and conducted with a reckless indifference to the rights of Plaintiffs and members of the Subclasses.

121.    As a direct and proximate result of Defendant's actions and omissions, Plaintiffs and the Subclasses have suffered and continue to suffer damages, including medical monitoring damages; monetary damages associated with the investigation, treatment, remediation, property damages, including, without limitation, loss of value, annoyance, disturbance, intrusion, harassment and inconvenience; all for which Plaintiffs and the Subclasses are entitled to recover damages.

**V.e.    Fifth Cause of Action – Private Nuisance Against FirstEnergy**

122.    Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

123.    The Property Owner Subclass members, as described above, are owners of real property with the right of possession.

124.     Pennsylvania has adopted the Restatement (Second) of Torts approach for determining the existence of a private nuisance. As such, one is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either (a.) intentional and unreasonable, or (b.) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities. *Tiongco v. Sw. Energy Prod. Co.*, No. 3:14-CV-1405, 2016 WL 6039130, at *3 (M.D. Pa. Oct. 14, 2016)

125.     At all times relevant to the present cause of action, Defendant operated the Hatsfield Ferry Power Station and Mitchell Power Station which produced the toxic coal ash which became airborne and contaminated the Plaintiffs' and the Property Owner Subclass' properties'.

126.     At the time the above-described, intentional, unreasonable, negligent, and/or reckless acts were performed by Defendant, Defendant had good reason to know or expect that large quantities toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium would and/or could be introduced into the properties of Plaintiffs and the Property Owner class.

127.     The above-described affirmative, voluntary, and intentional acts were performed with the reckless disregard of the potential for toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium to be disbursed through the water and air and onto the land and property of Plaintiffs and the Property Owner Subclass.

128.     Defendant's negligent, reckless, willful, and/or wanton actions and/or intentional failures to act caused an unknown quantity of toxic heavy metals including but not limited to

lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium to be released into the air as well as the surface and ground waters in and around the Refuse Site and Prep Site.

129.    The introduction of unknown quantities of toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium onto the property of the Plaintiffs and Property Owner Subclass unreasonably interfered with the use and enjoyment of their property.

130.    The damage to the homes, buildings, and personal property at their residences from the airborne coal ash has caused the Plaintiffs and the Subclass significant inconvenience and expense.

131.    This constitutes a substantial interference with the use of the properties such that it is offensive and has caused significant inconvenience or annoyance.

132.    By reason of the foregoing, Defendant is liable to Plaintiffs and the Property Owner Subclass for the damages that they have suffered as a result of Defendant's actions, the amount of which will be determined at trial, plus reasonable attorneys' fees and costs.

**V.f.    Sixth Cause of Action – Private Nuisance Against NRG Energy**

133.    Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

134.    Plaintiffs and the Property Owner Subclass, as described above, are owners of real property with the right of possession.

135.    Pennsylvania has adopted the Restatement (Second) of Torts approach for determining the existence of a private nuisance. As such, one is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the

26

private use and enjoyment of land, and the invasion is either (a.) intentional and unreasonable, or (b.) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities. *Tiongco v. Sw. Energy Prod. Co.*, No. 3:14-CV-1405, 2016 WL 6039130, at *3 (M.D. Pa. Oct. 14, 2016)

136.    At all times relevant to the present cause of action, Defendant operated the Elrama Power Station which produced the toxic coal ash became airborne and contaminated the Plaintiffs' and the Property Owner Subclass' properties.

137.    At the time the above-described, intentional, unreasonable, negligent, and/or reckless acts were performed by Defendant, Defendant had good reason to know or expect that large quantities toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium would and/or could be introduced into the properties of Plaintiffs and the Property Owner Subclass.

138.    The above-described affirmative, voluntary, and intentional acts were performed with the reckless disregard of the potential for toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium to be disbursed through the groundwater and air and onto the land and property of Plaintiffs and the Property Owner Subclass.

139.    Defendant's negligent, reckless, willful, and/or wanton actions and/or intentional failures to act caused an unknown quantity of toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium to be released into the air as well as the surface and ground waters in and around the Refuse Site and Prep Site.

140.    The introduction of unknown quantities of toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium onto the property of the Plaintiffs and Property Owner Subclass unreasonably interfered with the use and enjoyment of their property.

141.    The damage to the homes, buildings, and personal property at their residences from the airborne coal ash has caused the Plaintiffs and the Class significant inconvenience and expense.

142.    This constitutes a substantial interference with the use of the properties such that it is offensive and has caused significant inconvenience or annoyance.

143.    By reason of the foregoing, Defendant is liable to Plaintiffs and the Property Owner Subclass for the damages that they have suffered as a result of Defendant's actions, the amount of which will be determined at trial, plus reasonable attorneys' fees and costs.

**V.g.    Seventh Cause of Action – Private Nuisance Against MCC**

144.    Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

145.    Plaintiffs and the Property Owner Subclass, as described above, are owners of real property with the right of possession.

146.    Pennsylvania has adopted the Restatement (Second) of Torts approach for determining the existence of a private nuisance. As such, one is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either (a.) intentional and unreasonable, or (b.) unintentional and otherwise actionable under the rules controlling liability for negligent or

reckless conduct, or for abnormally dangerous conditions or activities. *Tiongco v. Sw. Energy Prod. Co.*, No. 3:14-CV-1405, 2016 WL 6039130, at *3 (M.D. Pa. Oct. 14, 2016)

147.     At all times relevant to the present cause of action, Defendant operated the Prep Site and Refuse Site which permitted and was the source of the toxic coal ash which was permitted by the Defendant to become airborne and contaminate the Plaintiffs' and the Property Owner Subclasses properties' as well.

148.     At the time the above-described, intentional, unreasonable, negligent, and/or reckless acts were performed by Defendant, Defendant had good reason to know or expect that large quantities toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium would and/or could be introduced into the properties of Plaintiffs and the property owner classes.

149.     The above-described affirmative, voluntary, and intentional acts were performed with the reckless disregard of the potential for toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium to be disbursed through the water and air and onto the land and property of Plaintiffs and the Property Owner Subclass.

150.     Defendant's negligent, reckless, willful, and/or wanton actions and/or intentional failures to act caused an unknown quantity of toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium to be released into the air as well as the surface and ground waters in and around the Refuse Site and Prep Site.

151.     The introduction of unknown quantities of toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited

to hexavalent chromium onto the property of the Plaintiffs and property owner classes unreasonably interfered with the use and enjoyment of their property.

152.    The damage to the homes, buildings, and personal property at their residences from the airborne coal ash has caused the Plaintiffs and the Property Owner Subclass significant inconvenience and expense.

153.    This constitutes a substantial interference with the use of the properties such that it is offensive and has caused significant inconvenience or annoyance.

154.    By reason of the foregoing, Defendant is liable to Plaintiffs and the Property Owner Subclass for the damages that they have suffered as a result of Defendant's actions, the amount of which will be determined at trial, plus reasonable attorneys' fees and costs.

**V.h.    Eight Cause of Action --Trespass as to All Defendants**

155.    Plaintiffs reallege and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

156.    This cause of action is brought pursuant to the laws of Pennsylvania.

157.    Plaintiffs and property damage class members have suffered and are suffering a continuing trespass as a result of Defendants' conduct.

158.    Defendants created, transported, and stored coal ash in such a manner so as to cause repeated, separate, and recurrent injuries to Plaintiffs' properties.

159.    The surrounding area and Plaintiffs' properties, including soil, air, and water, have been and continue to be seriously contaminated as a result of the actions taken by Defendants in the creation, transport, and storage of coal ash.

160.    Thus, Defendants created a condition which has resulted in the continuing discharge of contaminants via surface water, groundwater, and air onto Plaintiffs' land which

occurs to this day, and Defendants have breached their legal duties in failing to take action to remedy the condition.

161.    Pennsylvania follows the restatement with regard to trespass: "trespass is committed when one intentionally enters land in the possession of another, or causes a thing to do so." *Bruni v. Exxon Corp.*, 52 Pa. D. & C.4th 484, 503 (Com. Pl. 2001) quoting Restatement (Second) of Torts §158.

162.    All Defendants are liable for this continuing trespass as following § 427B of the Restatement (Second) of Torts: "[o]ne who employs an independent contractor to do work which the employer knows or has reason to know to be likely to involve a trespass upon the land of another or the creation of a public or a private nuisance, is subject to liability for resulting to others from such trespass or nuisance."

163.    Defendants negligently, recklessly, and/or intentionally produced, stored, and transported coal ash so as to contaminate Plaintiff's and class members' property.

164.    As a direct and proximate result of Defendants' trespass, Plaintiff has suffered and continues to suffer property damage requiring investigation, remediation and monitoring costs to be determined at trial.

165.    Defendants knew that it was substantially certain that its acts and omissions described above would threaten public health and cause extensive contamination of property, including groundwater collected for drinking. Defendants committed each of the above described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for the health and safety of others, and for Plaintiff's property rights.

## VI      DAMAGES SOUGHT BY THE SUBCLASSES

166.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

167.   Plaintiffs and the Subclasses seek damages sufficient to fund a medical monitoring program that is reasonably tailored to the exposure risks posed by of toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium.

168.   Plaintiffs and the Subclasses also seek damages sufficient to fund a blood test program to pay for the costs or an initial blood test, and such follow-up blood tests that are deemed necessary, to determine the current levels of toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium in the blood serum of the Plaintiffs and the Subclasses.

169.   Plaintiffs and the Subclasses seek monetary damages for each violation of the First through Eighth Claims for Relief. In particular, Plaintiffs and the Subclasses seek monetary damages:

(i)      sufficient to remediate class members' property from the contamination caused by Defendants' conduct or, in the alternative, to compensate class members for the diminution in value of their property caused by Defendants' conduct;

(ii)     to compensate class members for the loss of use and enjoyment of their properties caused by Defendants' conduct;

(iii)    and for such other monetary damages as are required to fully compensate Plaintiffs and the Subclasses for the loss of value of their properties caused by Defendants' conduct.

170.    Plaintiffs and the Subclasses seek punitive damages in an amount sufficient to deter Defendants' similar wrongful conduct in the future.

171.    In addition to the above, Plaintiffs and the Subclasses seek injunctive relief including, but not limited to, implementation of a mandatory testing protocol requiring Defendants to expeditiously test private properties or the presence of toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium and to continue that testing until it is determined that the risk of toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium contamination; to repair the homes and property that has been damaged as the result of airborne coal ash; to remediate the soil that has been contaminated with toxic heavy metals including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium; to establish and fund a blood testing program for Plaintiffs and members of the Subclasses; to establish and fund a medical monitoring program for Plaintiffs and members of the Subclasses; and to take all steps necessary to remediate the Affected Area.

V.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgment against the Defendants, as follows:

A.    An order certifying the proposed Property Owner Subclass, and the Non-Property Owner Subclass, and designating Plaintiffs as the named representatives of the respective Subclasses, and designating the undersigned as Class Counsel;

B.    An order requiring Defendants (i) to establish a blood testing program for Plaintiffs and the Subclasses; (ii) to establish a medical monitoring protocol for Plaintiffs and the

Subclasses to monitor individuals' health and diagnose at an early stage any ailments associated with exposure to toxic heavy metals, including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium; and (iii) to take all necessary steps to remediate the property and/or residences of Plaintiffs and the Property Owner Subclass to eliminate the presence of toxic heavy metals, including but not limited to lead, arsenic, and cadmium, as well as other toxic chemicals including but not limited to hexavalent chromium;

C.      An award to Plaintiffs and Subclass members of compensatory, exemplary, and consequential damages, including interest, in an amount to be proven at trial;

D.      An award of attorneys' fees and costs;

E.      An award of pre-judgment and post-judgment interest, as provided by law; and

F.      Such other and further relief as the Court deems just and proper.


                                        Respectfully Submitted,

Dated: June 21st, 2017                      /s/ W. Steve Berman
                                        W. Steve Berman, Esq. (PA #45927)
                                        One Greentree Center, Suite 201
                                        10,000 Lincoln Dr. E.
                                        Marlton, NJ 08053
                                        Phone: (856) 988-5574
                                        Fax: (636) 843-7603
                                            --and--
                                        Louise R. Caro, Esq.
                                        *Pro Hac Vice Application Forthcoming*
                                        Aaron R. Modiano
                                        *Pro Hac Vice Application Forthcoming*