IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH

HOLLY RICE, individually and as parent
and natural guardian of N.R., D.W.,
D.W., K.W., minor children; RUDOLPH
SMITH and YMA SMITH; GARY J.
KUKLISH and KIMBERLY KUKLISH;
GEORGE and URSULA C. MARKISH;
and DARREL REDMAN and GINA
REDMAN, individually and on behalf of
all others similarly situated,

        Plaintiffs,

   vs.

FIRST ENERGY CORP., NRG ENERGY,
INC., and MATT CANESTRALE
CONTRACTING, INC.,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**Case No. 2:17-cv-489-LPL**

**ECF Nos. 58 & 72**

## OPINION

LENIHAN, M.J.

      Currently pending before the Court for disposition are the Motions for Summary

Judgment filed by First Energy Corp. (ECF No. 58) and NRG Energy (ECF No. 72).  In

the motions, First Energy Corp. ("FEC") and NRG Energy (collectively, the "Energy

Defendants") ask the Court to dismiss all claims in Plaintiffs' First Amended Complaint

against them because they do not own or operate the power stations at issue in this

action, and under Pennsylvania law, a parent corporation is not liable for the conduct of

its subsidiaries.  For the reasons that follow, the Court will grant FEC's motion for

summary judgment and will grant/deny NRG Energy's motion for summary judgment. In addition, the Court will grant Plaintiffs leave to file an amended complaint for the purpose of adding proper party defendants.

I.    **FACTS**

Plaintiffs, who are owners and/or residents of private property in LaBelle and Luzerne Townships, instituted this class action to assert claims arising out of alleged environmental contamination and polluting of their property and persons by coal ash emanating from the LaBelle Refuse Site ("LaBelle Site"), which is owned and operated by Defendant Matt Canestrale Contracting, Inc. ("Canestrale"). First Am. Compl. , Intro. & ¶¶8, 13 ([ECF No. 12](#)). The coal ash at the LaBelle Site came from several closed power plants in Western Pennsylvania allegedly owned and/or operated by the Energy Defendants. *Id.* at ¶¶ 7-8, 10-11, 14.

Essentially, Plaintiffs assert four claims against the Energy Defendants: (1) Medical Monitoring; (2) Negligence; (3) Private Nuisance; and (4) Trespass. However, the Energy Defendants disclaim ownership of the closed power stations and seek dismissal from this action. The facts relating to their motions are set forth separately below.

   A.    **First Energy Corp.**

Plaintiffs allege that FEC owns and/or operates the Hatfield's Ferry and Mitchell Power Stations. *Id.* at ¶ 7. FEC disputes that it owns or operates Hatfield's Ferry or Mitchell Power Statements.

The record evidence supports the following relevant, undisputed facts.  FEC is a holding company whose principal business is the holding, directly or indirectly, of all the outstanding common stock of its principal subsidiaries, including Allegheny Energy, Inc. ("AE") and AE's principal subsidiaries, which includes Allegheny Energy Supply Co., LLC ("AE Supply").  *See* SEC Form 10-k Annual Report for FY ending 12/31/11, Ex. F attached to Pls.' Resp. to FEC's Concise Stmt. of Mat. Facts ("CSMF") (ECF No. 84-6 at 4).  On February 25, 2011, AE merged with a subsidiary of FEC, with AE continuing as the surviving corporation and becoming a wholly owned subsidiary of FEC.  *See* SEC 10-k Annual Report at 1 (ECF No. 84-6 at 4); AE Supply Co., LLC & Subsid. Consol. Fin. Stmts. for the Years Ended Dec. 31, 2017 and 2016 ("AE Supply Consol. Fin. Stmts."), Ex. C to Pls.' Resp. to FEC's CSMF (ECF No. 84-3 at 3).   AE was subsequently merged with and into FEC on January 1, 2014.  *See* AE Supply Consol. Fin. Stmts., *id.* at i (ECF No. 84-3 at 3).

According to James A. Arcuri, Senior Corporate Counsel for FirstEnergy Service Company, FEC does not own or operate any power stations.  Aff. of James A. Arcuri,[1] ¶ 4, Ex. A to FEC's CSMF (ECF No. 60-1 at 5).

AE Supply is an unregulated, indirect wholly owned, generation subsidiary of FEC.  *See* AE Supply Consol. Fin. Stmts. at 6 (ECF No. 84-3 at 4); SEC Form 10-k Report at i & 1 (ECF No. 84-6 at 3-4); SEC 8-k Report dated 7/8/13, Ex. G to Pls.' Resp. to FEC's CSMF (ECF No. 84-7 at 3).  *See also* Arcuri Aff., ¶¶ 2-3, (ECF No. 60-1 at 4).  AE Supply

---

[1] Mr. Arcuri further states that he serves as counsel to FEC and its subsidiaries.  Arcuri Aff., ¶ 2.

provides energy-related products and services to wholesale and retail customers.  AE

Supply Consol. Fin. Stmts. at 6 (ECF No. 84-3 at 4); SEC Form 10-k at 2 (ECF No. 84-6 at

5).  AE Supply also owns and operates fossil generation facilities in Pennsylvania, West

Virginia, and Virginia.   AE Supply Consol. Fin. Stmts. at 6 (ECF No. 84-3 at 4).

The Hatfield's Ferry Power Station provided coal combustion residuals to

Canestrale in 2007, 2008 and 2009, when Hatfield's was owned by AE Supply.  *See* Aff.

of David L.  Hoone,[2] ¶ 3, Ex. B to FEC's CSMF (ECF No. 60-1).  The Mitchell Power

Plant provided coal combustion residuals to Canestrale from 1998 through 2006, and

from 2009 through 2013.  Hoone Aff., ¶ 4; Supp. Aff. of Hoone, ¶ 3, Ex. A to FEC's

Supp. Mem. in Supp. of Summ. J. (ECF No. 78-1).  From 1998 until November 17, 1999,

the Mitchell Power Station was owned by West Penn Power Company.  Supp. Aff. of

Hoone, ¶ 3.  Thereafter, Mitchell was owned by AE Supply.   *Id.*; Hoone Aff., ¶ 4.

Purchase orders from 2003, 2006 and 2007 indicate that they were issued by

Allegheny Energy Service Corp., an Allegheny Energy Company, as agent for buyer—

AE Supply—for the purchase of the coal ash disposal service from the Mitchell Power

Station.  *See* Ex. A attached to Pls.' Resp. to FEC's CSMF (ECF No. 84-1 at 2-10).  These

purchase orders were issued pursuant to the agreement "between Allegheny Power

Service Corp. (APSC), on behalf of the owners/operators of the Mitchell Power Station

("Allegheny Power"), and Matt Canestrale Contracting, Inc. ("Canestrale") [dated

---

[2] David L. Hoone states that as the Supervisor, Coal Combustion Residues,
Environmental Department, for FirstEnergy Service Company, he has personal
knowledge of the matters contained in his affidavit.  Boone Aff., ¶ 2 (ECF No. 60-1 at 6).

4/21/99, and the amendments thereto] for the supply of coal combustion by-products ("CCBs") from Allegheny Power's Mitchell Power Station[.]" *Id.*; *see also* Excerpt from Agreement between Allegheny Power & Matt Canestrale Contracting, Inc. LaBelle Beneficial Use Project ("1999 Beneficial Use Agreement"), Ex. B attached to Pls.' Resp. to FEC's CSMF (ECF No. 84-2).

From June 2012 through January of 2013, several emails were exchanged between various individuals whose email addresses ended with "@FirstEnergy", and between counsel for Canestrale, William Gorton, and Joseph Kalan and/or John Luecken, regarding the renewal of the Beneficial Use Agreement. *See* Ex. D to Pls.' Resp. to FEC's CSMF (ECF No. 84-4). Although the email addresses of Kalan and Luecken ended with "@FirstEnergycorp.com," both Kalan and Luecken appear to be employees of FirstEnergy Service Company ("FESC"). *Id.*; *see also* Ex. E to Pls.' Resp. to FEC's CSMF (ECF No. 84-5 at 4); Decl. of James A. Meade, ¶4, Ex. B to FEC's Reply Br. (ECF No. 89-2). The address that appears after Luecken's name in his email indicates he is located at FESC. Ex. D (ECF No. 84-4 at 10-12). Kalan was acting in his capacity as an employee of FESC when he was involved in the negotiations of the renewal of the Beneficial Use Agreement with Canestrale in 2012 and 2013. Meade Decl., ¶4. FESC is a subsidiary of FEC and provides legal, financial and other corporate support services at cost, in accordance with its cost allocation manual, to affiliated FirstEnergy companies. *Id.* at ¶3.

On 6/27/13, a change to the purchase order ("change order") was issued by Kalan, as the authorized purchasing representative, for the removal of CCBs from the

"FirstEnergy Mitchell Plant" for transport to the LaBelle Site. *See* Ex. E to Pls.' Resp. to FEC's CSMF (ECF No. 84-5 at 2-4). The change order was issued pursuant to the new CCB Beneficial Use Agreement effective 10/15/12 between "FirstEnergy Service Company, for itself and on behalf of its affiliates, FirstEnergy Generation Corp. and Allegheny Energy Supply Co., LLC (collectively, "FirstEnergy"), and Matt Canestrale Contracting, Inc., . . .." *Id.* (ECF No. 84-5 at 2-5.) A subsequent amendment to the CCB Beneficial Use Agreement was executed on 1/18/13, again between FESC on behalf of its affiliates, FirstEnergy Generation, LLC and AE Supply, and Canestrale, to accommodate a greater quantity of CCB deliveries and provide additional assurance of continued performance. *Id.* (ECF No. 84-5 at 7.) The amendment was signed by Charles D. Lasky, V.P., Fossil Fleet Operations, on behalf of FESC. *Id.* (ECF No. 84-5 at 9).

On July 8, 2013, the officers of FEC and AE Supply committed to deactivating two coal-fired plants in Pennsylvania—Hatfield's Ferry and Mitchell—by October 9, 2013. *See* SEC Form 8-K Report dated 7/8/13, Ex. G to Pls.' Resp. to FEC's CSMF (ECF No. 84-7 at 3). Thereafter, FEC issued a news release announcing its plans to deactivate Hatfield's Ferry and Mitchell Power Stations on July 9, 2013. *Id.* (ECF No. 84-7 at 6-7). Subsequently, several news stories were published locally based on this news release. *See* Ex. H to Pls.' Resp. to FEC's CSMF (ECF No. 84-8).

### B.  NRG Energy

Plaintiffs allege that NRG Energy owns and/or operates the Elrama Power Plant. Am. Compl., ¶10. NRG Energy denied that it owns or operates the Elrama Power Plant,

and denied that it disposed of coal ash waste as alleged. NRG Energy's Ans. with Affirmative Defenses to Am. Compl., ¶¶ 4-5 (ECF No. 48).

The record evidence supports the following relevant, undisputed facts. GenOn Power Midwest LP owned the Elrama Power Plant prior to December 14, 2012. Decl. of Bradley Kranz at ¶¶ 8-9, NRG Ex. B (ECF No. 74-2 at 2). GenOn Power Midwest LP operated the Elrama Power Plant until October 1, 2012, when it deactivated the power plant and no longer operated it to produce electricity. *Id.* at ¶ 16. Coal ash continued to be removed from the Elrama Power Plant after it was deactivated and no longer operated to produce electricity, but no such coal ash was sent to the LaBelle Refuse Site. *Id.* at ¶ 11. The Elrama Power Plant has not been reactivated since it was deactivated on October 1, 2012, and no entity has operated it to produce electricity since that date. *Id.* at ¶¶ 10, 17-18.

On December 14, 2012, GenOn Energy, Inc. merged with Plus Merger Corporation, a wholly-owned subsidiary of NRG Energy; the surviving entity was GenOn Energy, Inc. Kranz Decl. at ¶ 8. At the time of the merger with Plus Merger Corporation, GenOn Power Midwest LP was a wholly-owned subsidiary of GenOn Energy, Inc. and owned the Elrama Power Plant. *Id.* at ¶ 9. As a result of the merger, GenOn Power Midwest LP became a wholly-owned, indirect subsidiary of NRG Energy. *Id.* at ¶ 12.

GenOn Power Midwest LP owned the Elrama Power Plant from December 14, 2012 through May 28, 2013. *Id.* at ¶ 14. On May 28, 2013, GenOn Power Midwest LP was renamed NRG Power Midwest LP. *Id.* at ¶ 13. Since May 28, 2013, NRG Power

Midwest LP has owned the Elrama Power Plant. *Id.* at ¶ 15; *see also* United States Bankruptcy Court, Southern District of Texas, Case No. 17-33695, ECF No. 406 (Assets and Liabilities of NRG Power Midwest LP), at 29, 31-32, 35, 39, 56, 68, & 73. NRG Power Midwest LP never operated the Elrama Power Plant for power generation. Kranz Decl. at ¶ 18. NRG Power Midwest LP is a wholly-owned, separately managed indirect subsidiary of GenOn Energy, Inc., the latter of which is a wholly-owned direct subsidiary of NRG Energy. *Id.* at ¶¶ 3, 8-9, 12-13.

In addition, the following facts are taken from Plaintiffs' Statement of Facts, incorporated in their Response to NRG Energy's Statement of Material Undisputed Facts (ECF No. 85 at 4 – 9). [3] Between December 11, 2007 and December 27, 2007, a number of employees from Reliant Energy, a predecessor to GenOn Energy, Inc., were involved in approving a three-year extension of the 2002 agreement[4] with Canestrale for

---

[3]Plaintiffs' Statement of Facts (ECF No. 85 at 4 – 9) contain a number of immaterial facts, *see* paragraphs 1 through 10 and 17, which the Court has disregarded for purposes of deciding the motions for summary judgment. In addition, paragraphs 1 through 4 refer to an exhibit that is not provided; and paragraph 6 refers generally to SEC 10-K Report of GenOn Energy, Inc., without identifying the exhibit letter, and the exhibit (H) contains 268 pages. Paragraphs 11, 18, and 20 are not supported by affidavit or other evidence. Paragraphs 12, 19, and 21 state conclusions not facts. The statement in Paragraph 13 is not supported by the cited exhibit. Paragraphs 14 through 16 cite to the GenOn Energy, Inc. 2010 SEC 10-K Report in Exhibit F, without any pinpoint citation, but Exhibit F does not contain the GenOn Energy, Inc. SEC 10-K Report—that document is located in Exhibit H, and contains 231 pages. Although paragraph 22 also cites to Exhibit H with no pinpoint citation, it is similar to NRG Energy's statement of facts. Thus, the Court will disregard the statements contained in paragraphs 1 through 22 of Plaintiffs' Statement of Facts in deciding the NRG Energy's summary judgment motion.

[4] Plaintiffs have attached a copy of Draft #2 of the March 1, 2002 LaBelle Landfill and Ash Management Agreement between Reliant Energy and Canestrale. *See* Ex. J attached to Pls.' Resp. to NRG Energy's Stmt. of Undisputed Mat. Facts (ECF No. 85-10).

disposing of CCBs from the Elrama Power Plant.  Pls.' Statement of Facts, ¶¶ 24 – 39

(ECF No. 85 at 7-9) (citing Exhibit I, ECF No. 85-9).  *See also,* NRG Energy, Inc. 2010 SEC

10-K Annual Report at 4 (ECF No. 85-6 at 29).

On January 20, 2012, GAI Consultants, Inc., on behalf of GenOn Energy, Inc.,

submitted a monthly summary of beneficial use of CCBs from GenOn Power Midwest's

Elrama Power Station for the period January 1, 2003 through the end of November,

2011, to the Pennsylvania Department of Environmental Protection ("PA DEP").   Pls.'

Stmt. of Facts, ¶ 43 (citing Ex. J at MCC020217 (ECF No. 85-10 at 8)).  On December 17,

2007, the PA DEP issued a Residual Waste General Permit to Reliant Energy for

beneficial use of coal ash from coal-fired power plants, as well as other materials.   Pls.'

Stmt. of Facts, ¶ 44 (citing Ex. K (ECF No. 85-11 at 2-4)).

On October 5, 2012, Mark Hopkins, a staff sourcing specialist with GenOn

Energy, Inc., advised James Flaherty that GenOn Energy, Inc. was terminating its

contract with Canestrale effective October 1, 2012, because it no longer needed scrubber

sledge trucking services due to the Elrama plant closure.   Pls.' Stmt. of Facts, ¶¶ 40-41

(citing Ex. I at MCC020380).

C.    **Relevant Procedural History**

At the initial case management conference on March 6, 2018, the Court instructed

the Plaintiffs to conduct discovery regarding whether FEC and NRG Energy are proper

party defendants in the next 60 days.   (ECF No. 63 at 2).   Plaintiffs did not commence

---

Although unexecuted, that agreement states that as of March 2002, Reliant Energy
owned and operated the Elrama Power Station. *See* ECF No. 85-10 at 3.

discovery against NRG Energy within the 60-day period, but counsel for Plaintiffs stated during the May 8, 2018 telephone conference that he intended to serve RFPs on NRG Energy that week. (ECF No. 67 at 2). Counsel for Plaintiffs did serve RFPs on FEC on 5/5/18. *Id.* During the 5/8/18 telephone conference, Plaintiffs' counsel requested an additional 60 days to complete discovery on this issue, so that he would have time to depose one or two 30(b)(6) witnesses after he received the responses to his discovery requests. *Id.* The Court extended the discovery deadline to July 6, 2018 on the issue of whether FEC and NRG Energy were proper party defendants. *Id.* at 3 (ECF No. 67 at 3).

Plaintiffs did not serve RFPs on NRG Energy the week of May 8, 2018 or any time thereafter. Decl. of Jeremy A. Mercer at ¶4, NRG Ex. A (ECF No. 74-1 at 1). Nor did Plaintiffs serve discovery requests of any kind on NRG Energy, or notice a deposition of NRG Energy. *Id.* at ¶¶ 4-6.

## II.   LEGAL STANDARD

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

More specifically, the moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting FED. R. CIV. P. 56(e)) (emphasis added by *Matsushita* Court). An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.    DISCUSSION

### A.    FEC's Motion for Summary Judgment

FEC maintains that based on the affidavits of Hoone and Arcuri, it is undisputed that the Hatfield's Ferry and Mitchell Power Stations were owned and operated by its wholly-owned subsidiary, AE Supply, at the relevant times. Citing legal precedent holding that a parent corporation is not liable for the acts of its subsidiaries merely based on its ownership of the subsidiary, FEC submits that it cannot be held liable for conduct that was allegedly committed at and by the power stations owned by its wholly-owned subsidiary. In addition, FEC notes that while precedent does exist which holds a parent corporation liable for the conduct of its subsidiary, such liability has only been imposed on the parent corporation where the parent corporation dominates a subsidiary to such a degree that the subsidiary is a mere instrumentality of the parent or amounts to a sham corporation. FEC argues that such is not the case here, as Plaintiffs

have not alleged, nor could they allege, any facts that would support a claim that AE Supply's corporate existence should be disregarded.

In response, Plaintiffs submit that FEC's overly simplified factual statements and legal arguments ignore the complex factual history of mergers and acquisitions, coal ash contract negotiations, contracts for the disposal of the coal ash at issue in this litigation, and how FEC held itself out to the public as owner/operator of the former Mitchell and Hatfield's Ferry power stations at the relevant times. Moreover, Plaintiffs submit that the actual operations and control exercised by FEC over its subsidiaries make it the de facto owner and operator of the power stations at issue during the relevant times, making it legally liable for the coal ash at issue. At the very least, Plaintiffs contend that factual issues exist as to which entity or entities actually owned and/or operated the Hatfield's Ferry and Mitchell Power Stations rendering summary judgment inappropriate at this juncture. And, in any event, Plaintiffs contend they should be allowed leave to amend their complaint to add several subsidiaries of FEC as defendants.

The Supreme Court has made clear: "It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation . . . is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (citations omitted). Just as mere ownership of a subsidiary will not justify imposing liability on the parent, so too a mere commonality of some or all of the directors or executive officers will not provide a basis for imposing liability on the parent corporation. *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484 (3d Cir. 2001) (citing

*Bestfoods*, 524 U.S. at 69).  With these precepts in mind, the Court turns to Plaintiffs'

arguments in opposing FEC's motion for summary judgment.

### 1. Successor Liability of FEC

Plaintiffs first argue that FEC is liable as the successor by merger with Allegheny

Power.  In support, Plaintiffs cite to *Philadelphia Electric Co. v. Hercules, Inc.,* 762 F. 2d

303, 308 (3d Cir. 1985), which sets forth four factors that should be considered in

determining whether a particular transaction amounts to a *de facto* merger,[5] as

---

[5] Quoting the district court's opinion in the case before it, the court of appeals in
*Philadelphia Electric Co.* explained what is necessary to show a de facto merger:

> "In determining whether a particular transaction amounts to
> a de facto merger as distinguished from an ordinary
> purchase and sale of assets most courts look to the following
> factors:
>
> (1) There is a continuation of the enterprise of the seller
> corporation, so that there is continuity of management,
> personnel, physical location, assets, and general business
> operations.
>
> (2) There is a continuity of shareholders which results from
> the purchasing corporation paying for the acquired assets
> with shares of its own stock, this stock ultimately coming
> to be held by the shareholders of the seller corporation so
> that they become a constituent part of the purchasing
> corporation.
>
> (3) The seller corporation ceases its ordinary business
> operations, liquidates, and dissolves as soon as legally and
> practically possible.
>
> (4) The purchasing corporation assumes those obligations
> of the seller ordinarily necessary for the uninterrupted
> continuation of normal business operations of the seller
> corporation."

distinguished from an ordinary purchase and sale of assets. However, Plaintiffs do not attempt to show or analyze how the summary judgment record supports a finding that each of those factors has been met here. Rather, Plaintiffs make the single, conclusory statement that "there can be no issue that FE is the successor by *de jure* merger with Allegheny Power." Pls.' Br. in Opp'n at 7 (ECF No. 83). Plaintiffs' argument is woefully inadequate, and the Court is not required to consider any undeveloped or conclusory arguments. *Reynolds v. Wagner*, 128 F.3d 166, 178 (3d Cir. 1997) ("[A]n argument consisting of no more than a conclusory assertion [consisting of a single statement] (without even a citation to the record) will be deemed waived.") (citing *Pennsylvania v. U.S. Dep't of Health & Human Servs.*, 101 F.3d 939, 945 (3d Cir. 1996) (conclusory assertions mentioned in passing without any argument are insufficient and will be deemed waived); *Massie v. U.S. Dep't of Housing & Urban Dev.,* Civ. A. No. 06-1004, 2007 WL 184827, *3 n. 5 (W.D.Pa. Jan. 19, 2007) (finding a one-sentence assertion which lacked any substantive or meaningful analysis to be undeveloped and wholly inadequate) (citing *Pennsylvania v. U.S. Dep't of Health & Human Servs., supra*). Accordingly, the Court finds no merit to Plaintiffs' conclusory, undeveloped argument that FEC is the successor by *de jure* merger with Allegheny Power.[6]

---

762 F.2d at 310 (quoting *Phila. Elec. Co. v. Hercules, Inc*., 587 F.Supp. 144, 151-152 (E.D.Pa.1984) (internal citations omitted).

[6] In any event, the record shows that AE Supply owned (and still owns) the Mitchell Power Station. Therefore, when AE merged with FEC in 2014, FEC did not become the owner of the Mitchell Power Station, it became the parent of AE Supply, which continued to own the Mitchell Power Station. *See* Consolidated Financial Statements of AE Supply and its subsidiaries for 2016 and 2017 (Pls.' Ex. C, ECF No. 84-3).

### 2. Liability Based on FEC's Alleged Role as the Contracting Party w/ Canestrale for 2012 CCB Beneficial Use Agreement & 2013 Amendment

Plaintiffs next argue that FEC is liable to them because it directly negotiated and entered into a contract that extended the former Allegheny Power 1999 Beneficial Use Agreement for the disposal of the CCBs giving rise to this lawsuit, and therefore, there is no need to pierce any corporate veil as FEC is potentially liable in its own right. Notwithstanding the utter lack of development of this argument, the summary judgment record belies Plaintiffs' argument. Plaintiffs' own documents show that the original beneficial use agreement was executed on 4/21/99 between Allegheny Power and Canestrale, well prior to AE's merger with a subsidiary of FEC on 2/25/11. After the merger, in 2012, Kalan and Luecken, employees of FESC, exchanged several emails with counsel for Canestrale in an effort to reach an agreement on the terms of a new CCB Beneficial Use Agreement. On 10/15/12, the new CCB Beneficial Use Agreement was entered into between FESC, on its own behalf and on behalf of its affiliates, specifically AE Supply and FirstEnergy Generation Corp. The subsequent amendment to the 2012 Beneficial Use Agreement on 1/18/13 was signed by Charles Lasky of FESC. Moreover, both AE Supply and FESC are separately existing subsidiaries of FEC. Thus, the summary judgment record does not support Plaintiffs' undeveloped, conclusory argument that FEC directly negotiated and entered into the 2012 CCB Beneficial Use Agreement and the 2013 amendment to that Agreement. Indeed, the record supports the opposite conclusion. Accordingly, the Court cannot find that FEC may be potentially liable to Plaintiffs based on their unsupported and conclusory argument that

FEC directly negotiated and entered into the 2012 CCB Beneficial Use Agreement and the 2013 amendment.

### 3. Whether FEC is the *de facto* Owner/Operator of the Power Stations

Finally, Plaintiffs argue that when a subsidiary is not a separate and independent corporation, but rather, is the alter ego of the parent company, or if the subsidiary is the agent for the parent in a specific transaction, liability may be imposed on the parent corporation. Here Plaintiff contends that sufficient evidence exists to show that AE Supply is merely the alter ego of FEC, or at the very least, shows that issues of fact exist precluding summary judgment on this issue. In support of its argument, Plaintiffs point to the following factors: (1) Because FEC is the sole member of AE Supply, an LLC, FEC controls it, and as the sole general partner, FEC is liable for AE Supply's debts; (2) FEC and AE Supply act as a single entity for federal and state income tax purposes; (3) FEC made the decision to close the two power stations; (4) FEC compensated the unemployed workers of the two power plants; (5) FEC negotiated contracts on behalf of AE Supply; (6) FEC derives its income from AE Supply; (7) FEC lends money to AE Supply at below market rates; and (8) FEC holds itself out to the SEC and the public as the owner and operator of the two power stations. Thus, Plaintiffs submit that this evidence is sufficient to hold FEC liable for the actions of AE Supply and defeat summary judgment or, at the very least, they should be allowed leave to amend their complaint to add several subsidiaries of FEC as defendants.

In essence, Plaintiffs are seeking to pierce the corporate veil through the alter ego theory—"'where the individual or corporate owner controls the corporation to be pierced and the controlling owner is to be held liable.'" *Lieberman v. Corporacion Experienca Unica, S.A.*, 226 F.Supp. 3d 451, 467-68 (E.D.Pa. 2016) (quoting *Miners, Inc. v. Alpine Equip. Corp.*, 722 A.2d 691, 695 (Pa. Super. Ct. 1998)). "To prevail under the alter-ego theory, . . . a plaintiff must demonstrate that '[t]he degree of control exercised by the parent [is] greater than normally associated with common ownership and directorship.'" *In Re Suboxone Antitrust Litig.*, MDL No. 2445, 13-MD-2445, 2017 WL 4810801, *10 (E.D. Pa. Oct. 25, 2017) (quoting *In re Latex Gloves Prods. Liab. Litig.*, No. MDL 1148, 2001 WL 964105, at *3 (E.D. Pa. Aug. 22, 2001)). "Plaintiffs must prove that the parent controls the day-to-day operations of the subsidiary such that the subsidiary can be said to be a mere department of the parent." *Id.* (quoting *Latex Gloves*, 2001 WL 964105, at *3 n.10 (quoting *Arch v. Am Tobacco Co.*, 984 F. Supp. 830, 837 (E.D. Pa. 1997)).

In *Lumax Industries, Inc. v. Aultman*, the Pennsylvania Supreme Court set forth the requirements for piercing the corporate veil under Pennsylvania law:

> We note at the outset that there is a strong presumption in Pennsylvania against piercing the corporate veil. *Wedner v. Unemployment Board*, 449 Pa. 460, 464, 296 A.2d 792, 794 (1972) ("[A]ny court must start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception.... Care should be taken on all occasions to avoid making the entire theory of corporate entity useless. *Zubik v. Zubik*, 384 F.2d 267, 273 (3d Cir.1967)"). Also, the general rule is that a corporation shall be regarded as an independent entity even if its stock is owned entirely by one person. *College Watercolor Group, Inc. v. William H. Newbauer, Inc.*, 468 Pa. 103, 117, 360 A.2d 200, 207 (1976).

*Lumax*, 669 A.2d 893, 895 (Pa. 1995). Thus, generally, "members of a limited liability company or shareholders of corporations are 'not personally liable to perform corporate obligations.'" *Lieberman*, 226 F.Supp. 3d at 467 (quoting *Kaplan v. First Options of Chicago, Inc.*, 19 F.3d 1503, 1520–21 (3d Cir. 1994)). The courts will disregard the general rule and allow the corporate veil to be pierced "only when 'the corporation was an artifice and a sham to execute illegitimate purposes and [an] abuse of the corporate fiction and immunity that it carries.'" *Id.* (citing *Kaplan*, 19 F.3d at 1521 (alteration in original) (quoting *Wheeling–Pittsburgh Steel Corp. v. Intersteel, Inc.*, 758 F.Supp. 1054, 1058 (W.D. Pa. 1990)).

The factors to be considered in determining whether to pierce the corporate veil include, among other things, "undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs and use of the corporate form to perpetrate a fraud." *Lumax*, 669 A.2d at 895 (quoting *Kaites v. Dep't of Envtl. Res.*, 529 A.2d 1148, 1151 (Pa. Commw. Ct. 1987) (citing *Dep't of Envtl. Res. v. Peggs Run Coal Co.*, 423 A.2d 765 (Pa. Commw. Ct. 1980)) (internal quotation marks omitted) (other citation omitted). In addition to these factors, the court of appeals has instructed the courts to consider whether "the company is not paying dividends; [ ] the dominant shareholder has siphoned funds from the company; [ ] other officers or directors are not functioning; [ ] there is an absence of corporate records; and [ ] the corporation is merely a façade for the operations of the dominant stockholder or stockholders." *Lieberman,*

226 F.Supp. 3d at 468 (quoting *Kaplan,* 19 F.3d at 1521 (quoting *United States v. Pisani,* 646 F.2d 83, 88 (3d Cir. 1981)) (internal quotation marks omitted).

The party attempting to pierce the corporate veil bears the burden of proof on this issue by clear and convincing evidence. *Publicker Indus., Inc. v. Roman Ceramics Corp.,* 603 F.2d 1065, 1069 (3d Cir. 1979) (citation omitted); *Trustees of Nat'l Elevator Indus. Pension v. Lutyk,* 332 F.3d 188, 194 (3d Cir. 2003) (citing *Kaplan,* 19 F.3d at 1522). Moreover, resolution of this issue is fact based and must be supported by the record. *Trustees of Nat'l Elevator Indus. Pension v. Lutyk,* 140 F. Supp. 2d 447, 457 (E.D.Pa. 2001) (citing *Carpenters Health & Welfare Fund of Phila. & Vicinity v. Ambrose,* 727 F.2d 279, 283 (3d Cir. 1983), *overruled in part on other grounds by McMahon v. McDowell,* 794 F.2d 100, 108 (3d Cir. 1986)), *aff'd* 332 F.3d 188 (3d Cir. 2003).

Viewing the evidence in the light most favorable to Plaintiffs, the non-moving parties, the Court finds that a reasonable jury could not find that AE Supply is the alter ego of FEC. Plaintiffs have failed to proffer any evidence, let alone clear and convincing evidence, to show, or at least raise a factual issue for the jury, that any of the factors supporting piercing the corporate veil exist here. The Court will address each of the factors proffered by Plaintiffs below.

The first basis proffered by Plaintiffs—that FEC is the sole member of AE Supply, an LLC, and therefore controls it and is liable for AE Supply's debts—has been decided as a matter of law to the contrary. *Lumax,* 669 A.2d at 895 (citation omitted); *Lieberman,* 226 F. Supp. 3d at 467 (quoting *Kaplan,* 19 F.3d at 1520-21).

Next, Plaintiffs rely on a statements appearing in AE Supply's consolidated financial statements for the years ended 12/31/16 and 12/31/17—that (1) AE Supply "is party to an intercompany income tax allocation agreement with FE that provides for the allocation of consolidated tax liabilities. Net tax benefits attributable to FirstEnergy . . . are reallocated to the subsidiaries of FirstEnergy that have taxable income" (Pls.' Ex. C at 11, ECF No. 84-3 at 5); and (2) "AE Supply is treated as a division (i.e., disregarded entity) of its parent company, FE, for federal and state income tax purposes. As a result, AE Supply's NOLs are treated as an attribute of FE for federal and state income tax purposes" (Pls.' Ex. C at 13, ECF No. 84-3 at 6). However, statements like this in consolidated financial statements do not show that FEC exercises a greater than normal degree of control over AE Supply. *See Suboxone*, 2017 WL 4810801, at *11; *see also Action Mfg. Co., Inc. v. Simon Wrecking Co.*, 375 F. Supp. 2d 411, 424 (E.D. Pa. 2005) (holding that neither references to subsidiaries as divisions of the parent company, nor references to parent and subsidiaries as "we," "our," and "us[,]" in the parent's annual report established an alter ego relationship). Nor does the fact that a parent corporation filed consolidated financial statements with its subsidiary mandate a finding of an alter ego relationship.[7] *Suboxone*, 2017 WL 4810801, at *11 (citing *Savin Corp. v. Heritage Copy Prods., Inc.*, 661 F. Supp. 463, 471 (M.D. Pa. 1987)).

---

[7] Indeed, the fact that separate consolidated financial statements were prepared for AE Supply and its subsidiaries for 2016 and 2017 shows that AE Supply maintained corporate formalities.

Similarly, Plaintiffs' reliance on statements regarding intra-company borrowing and repayment at below market rates in AE Supply's 2016 and 2017 consolidated financial statements does not show that FEC and AE Supply disregarded their corporate or business forms for their financial benefit. The court of appeals has held that "[l]oans from shareholders generally do not justify piercing the corporate veil, unless the shareholder chooses to require repayment of the loans while the company is insolvent." *Indagro SA v. Nilva*, 733 F. App'x 50, 53 (3d Cir. 2018) (citing *Trustees of Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*, 332 F.3d 188, 198 (3d Cir. 2003) (citing *Matter of Multiponics, Inc.*, 622 F.2d 709, 718 (5th Cir. 1980) and *United States v. Pisani*, 646 F.2d 83, 88 (3d Cir. 1981))). Plaintiffs have failed to present any evidence of insolvency on the part of AE Supply. Thus, it would seem that providing a loan to a solvent subsidiary is the opposite of siphoning its assets, thus undercutting Plaintiff's argument that AE Supply is the alter ego of FEC.

In further support of their alter ego theory, Plaintiffs turn to statements excerpted from FEC's 2011 SEC Form 10-K to show that FEC closely controls its subsidiaries, including AE Supply, which are set forth on page 4 of Plaintiff's Response to FEC's Statement of Undisputed Material Facts (ECF No. 84 at 4). However, the excerpted statements merely describe typical parent-subsidiary relationships and report events involving AE Supply that may affect FEC's bottom line. For example, Plaintiffs offer as proof that FEC closely controls its subsidiaries, the statements "FirstEnergy actively participates . . . and otherwise monitors and manages its companies in response to the ongoing development, implementation and enforcement of the reliability

standards implemented and enforced by the RFC[,]" and "FE's primary source of cash for continuing operations as a holding company is cash from the operations of its subsidiaries." (ECF No. 84 at 4 (citing Ex. F at 14 (ECF No. 84-6 at 7)).) These statements fall way short of showing that FEC actually controlled the daily operations of AE Supply. Indeed, a parent company is entitled to receive distributions of its subsidiary's profits in the form of cash dividends. *See In re Chocolate Confectionary Antitrust Litig.*, 674 F. Supp. 2d at 599-600 (citing *Action Mfg. Co., Inc. v. Simon Wrecking Co.*, 375 F. Supp. 2d 411, 425 (E.D. Pa. 2005)) (other citations omitted). Moreover, the fact that AE Supply pays dividends to FEC actually indicates that these companies are observing corporate formalities. *Id.*

The other statements relied upon by Plaintiffs in FEC's 2011 SEC 10-K Report are nothing more than a consolidation by description of AE Supply's efforts with that of its parent, FEC. A statement in SEC filings in which the parent consolidates by description its subsidiary's efforts and its own "'is not atypical, and certainly does not suggest that, via fraud or its equivalent, the parent corporation has become indistinguishable from the subsidiary.'" *Suboxone*, 2017 WL 4810801, at *11 (quoting *MacQueen v. Union Carbide Corp.*, No. 13-831, 2014 WL 6809811, at *7 (D. Del. Dec. 3, 2014)) (other citation omitted); *see also In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 570-71 (M.D. Pa. 2009) (evidence consisting of statements in annual reports that indicate the parent corporation and subsidiaries cultivated a "unified global image" does not demonstrate that the parent corporation actually controlled the daily affairs of its subsidiaries).

Thus, the statements relied upon by Plaintiffs do not show that FEC actually controlled the day to day operations of AE Supply.

Moreover, Plaintiffs' reliance on the use of the term "FirstEnergy" throughout the 2011 SEC 10-K Report to establish that the FEC is controlling the day-to-day business operations of AE Supply, or any of its other subsidiaries for that matter, is misplaced. As the glossary of terms in the annual report makes clear, "FirstEnergy," means "FirstEnergy Corp., together with its consolidated subsidiaries[.]" 2011 SEC 10-K Report, Glossary of Terms, at i (ECF No. 84-6 at 3). In light of the meaning ascribed to "FirstEnergy" in the glossary of terms, the use of the term "First Energy" in statements such as "FirstEnergy may incur significant costs to reduce sulfate discharges . . . from the coal-fired Hatfield's Ferry and Mitchell Plants[,]" " FirstEnergy's future cost of compliance with any [CCB] regulations . . . could be substantial and . . . have an adverse impact on FirstEnergy's results of operations and financial condition[,]" or "FirstEnergy currently has long-term coal contracts to acquire 34.5 million tons of coal for the year 2012 . . . ,"[8] is nothing more than a consolidation by description of AE Supply's efforts

---

[8] Nor does this statement support Plaintiffs' position that FEC directly contracted for the supply of coal to its subsidiaries. The evidence produced by Plaintiffs in opposing summary judgment establishes that FEC did not contract for the supply of coal. The purchase orders from 2003, 2006 and 2007 clearly indicate that the buyer was AE Supply (see ECF No. 84-1 at 2-10), and the purchases orders were issued pursuant to the 1999 Beneficial Use Agreements executed by Allegheny Power and Canestrale (ECF No. 84-2). The 2012 CCB Beneficial Use Agreement and subsequent amendment in 2013 were executed by FESC on behalf of AE Supply and FirstEnergy Generation Corp. (ECF No. 84-5 at 5-9), and the change order issued pursuant to the 2012 agreement as amended was signed by Joseph Kalan, on behalf of FESC (ECF No. 84-5 at 2-4). Kalan, who negotiated the 2012 CCB Beneficial Use Agreement and the 2013 amendment with Canestrale's counsel, was employed by FESC, as indicated on the change order, see ECF

with that of its parent, FEC. *See Suboxone*, 2017 WL 4810801, at *11. As such, the use of the term "FirstEnergy" "'is not atypical, and certainly does not suggest that, via fraud or its equivalent, the parent corporation has become indistinguishable from the subsidiary.'" *Id.* (citations omitted).[9]

Plaintiffs rely on several statements to show that FEC made the decision to close the Hatfield's Ferry and Mitchell Power Stations. First, Plaintiffs point to the following statement in the 2011 SEC 10-K Report: "FirstEnergy controls the following generation sources as of January 31, 2012, shown in the table below . . ." (which lists the Hatfield's Ferry and Mitchell plants). Again, the use of the term "FirstEnergy" is nothing more than a consolidation by description of AE Supply's efforts with that of its parent, FEC. In addition, Plaintiffs point to statements in the SEC 8-K Report dated 7/8/13[10] and 7/9/13 Press Release[11] (Pls.' Ex. G, ECF No. 84-7) to show that FEC made the decision

---

No. 84-5 at 4, and confirmed by James Meade, counsel for FESC, *see* Meade Aff. at ¶4 (ECF No. 89-2 at 2).

[9] Similarly, the use of same email address, i.e., "@firstenergycorp.com" by the employees of the parent corporation and its subsidiaries does not show that FEC exercises greater than normal control over its subsidiaries. The Court observes that this is a common practice among consolidated companies.

[10] The portion of the SEC 8-K Report upon which Plaintiffs rely states:

> On July 9, 2013, FirstEnergy Corp. issued a press release regarding plans to deactivate two coal-fired plants in Pennsylvania . . .. [E]ligible employees will receive severance benefits in 2013 that are currently estimated to be approximately $16 million ($10 million after-tax) and will also be recognized in the second quarter of 2013. These charges are expected to reduce FirstEnergy Corp.'s basic earnings per share of common stock by $0.79 for the quarter ended 30, 2013.

Ex. G, ECF No. 84-7 at 3.

[11] The pertinent portion of the Press Release states as follows:

to de-activate the Hatfield's Ferry and Mitchell plants as the owner and operator of the plants and compensated the unemployed workers at those plants. In essence, Plaintiffs are asking the Court to conclude, merely from the announcement of plant closings, that FEC is the owner/operator of the plants. This is a leap the Court is not willing to make, especially where there is a dearth of evidence establishing alter ego.

First, the reference to "FirstEnergy" throughout the press release does not provide evidence that FEC and not AE Supply owns and operates the power plants. The Court rejected this type of evidence in its discussion *supra* at 18-20 regarding the statements contained in the 2011 SEC 10-K Annual Report. Significant to this case, courts have rejected a plaintiff's attempt to rely on a press release in which the parent company consolidated its subsidiary's actions with its own. *See, e.g., MacQueen v. Union Carbide Corp.,* No. 13-831, 2014 WL 6809811, at *7 (D. Del. Dec. 3, 2014). In *MacQueen,* the parent company stated in a press release that it "designs and constructs" aircraft carriers for the Navy but, in actuality, its subsidiary was actually the company that built

---

Akron, Ohio – FirstEnergy Corp. (NYSE: FE) announced today it expects to deactivate two coal-fired power plants located in Pennsylvania . . . based on the cost of compliance with current and future environmental regulations . . .. The plants scheduled to be deactivated are Hatfield's Ferry Power Station in Masontown, Pa., and Mitchell Power Station in Courtney, Pa. . . . In total, about 380 plan employees and generation related positions are expected to be affected. Eligible employees will receive severance benefits through the FirstEnergy plan or as provided by their collective bargaining agreement. . . . Following the deactivation of the Hatfield's Ferry and Mitchell power stations, FirstEnergy will continue to operate one of the nation's largest, cleanest and most diversified electric generating fleets. . . .

Ex. G, ECF No. 84-7 at 5-6.

the carriers. The court found that "a statement like this in an SEC filing—in which a parent corporation is in some way consolidating by description its subsidiary's efforts and its own—is not atypical, and certainly does not suggest that, via fraud or its equivalent, the parent corporation has become indistinguishable from the subsidiary." *Id.* (citing *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d at 570-71) (other citations omitted).

Second, it is not uncommon for a parent corporation to exercise some control over, or be involved in, major decisions regarding the business of its subsidiaries. *See Newman v. Motorola, Inc.*, 125 F. Supp. 2d 717, 723 (D. Md. 2000) ("the fact that [the parent company] will control certain decisions and even must approve changes does not mean the two companies operate as one.") (citing *Dewhurst v. Telenor Invest AS*, 83 F. Supp. 2d 577, 589 (D. Md. 2000) ("[T]he fact that a parent requires its approval for certain extraordinary loans or ventures does not mean that the parent is controlling the subsidiary.")); *see also In re School Asbestos Litig.*, No. 83-0268, 1993 WL 209719, *6 (E.D. Pa. June 15, 1993) ("The parent corporation has the right to protect its investment by supervising and actively participating in the subsidiary's management." (citing *Craig v. Lake Asbestos of Quebec, Ltd.*, 843 F.2d 145,151 (3d Cir. 1988) (refusing to pierce veil despite evidence of parent's "widespread involvement" in the subsidiary's "financial and management decisions"), and *James E. McFadden, Inc. v. Baltimore Contractors, Inc.*, 609 F.Supp. 1102, 1105 (E.D.Pa.1985) ("an active part in management does not alone constitute control")).

Giving Plaintiffs the benefit of all reasonable inferences, at best a reasonable jury could find, based on the Press Release, that FEC had some involvement in the decision to deactivate the power stations. As noted above, this is insufficient to pierce the corporate veil. Thus, no reasonable jury could find that FEC exercised the degree of control necessary over AE Supply's daily operations to establish that AE Supply was the alter ego of FEC solely from the statements in the Press Release.

Finally, the newspaper articles in Plaintiffs' Exhibit H do not add any credence to their argument that FirstEnergy made the decision to de-activate the power plants. The newspaper articles merely quote and/or incorporate the information in FEC's press release and in no way constitute a separate statement made by FEC or any of its authorized representatives. Thus, Plaintiffs' reliance on the newspaper articles fails to meet their burden of proof for the same reasons delineated above as to the Press Release itself.

In summary, Plaintiffs' arguments and evidence fail to establish any of the factors delineated by the courts as indicative of alter ego, or raise material questions of fact on this issue.[12] The Court notes that Plaintiffs were afforded an opportunity to conduct discovery to obtain information to satisfy their burden of proof on this issue,

---

[12] Even if Plaintiffs had adduced evidence that FEC the necessary control over AE Supply's daily activities, they would not have met their burden of proving AE Supply was the alter ego of FEC. Pennsylvania requires a fraud element also be proven to successfully pierce the corporate veil, see *Liebermann*, 226 F. Supp. 3d at 467, and there is simply no evidence in the record to show that the relationship between FEC and AE Supply was a sham.

but failed to proffer any evidence to satisfy their burden of proof. Accordingly, the Court finds that based on the record evidence, no reasonable jury could find that FEC owns and operates the Hatfield Ferry and Mitchell Power Plants, and that Defendant FEC is entitled to summary judgment in its favor as a matter of law.

### B.  NRG Energy's Motion for Summary Judgment

NRG Energy argues that it is undisputed that the Elrama Power Plant is owned by NRG Power Midwest LP, a wholly-owned, separately managed, indirect subsidiary of GenOn Energy, Inc. which, in turn, is a wholly-owned subsidiary of NRG Energy. However, NRG Energy submits that the relationship of NRG Energy and NRG Power Midwest LP as parent and subsidiary, respectively, is insufficient to place liability upon NRG Energy for the actions of NRG Power Midwest LP. NRG Energy further argues that Plaintiffs have failed to produce any evidence, let alone clear and convincing evidence, to support a finding that NRG Power Midwest LP is the alter ego of NRG Energy, and thus, have failed to pierce the corporate veil. Accordingly, NRG Energy requests that summary judgment be entered in its favor.

In response, Plaintiffs raise substantially the same arguments as those raised in opposition to FEC's motion for summary judgment. Essentially, Plaintiffs submit that they need not pierce the corporate veil because NRG Energy succeeds by merger to former entities that actually contracted for the dumping of the coal dust and would be liable if they continued to exist. In addition, Plaintiffs contend that NRG Energy is directly liable because its predecessor, Reliant, negotiated and participated in the execution of an extension of the agreement with Canestrale that extended the prior

contract until the Elrama Power Plant was closed.  Alternatively, Plaintiffs argue that to the extent piercing the corporate veil is necessary, the evidence establishes at least a factual issue as to NRG Energy's control of NRG Power Midwest, a "non-corporation of which NRG is the ultimate controlling member[.]"  Pls.' Br. in Opp'n at 2 (ECF No. 86).

With regard to Plaintiffs' first argument, it is almost identical to the one they raised in opposition to FEC's summary judgment motion—Plaintiffs make the conclusory, unsupported, undeveloped argument that "there can be no issue that NRG is the successor by *de jure* merger with Orion Power/Reliant Energy/GenOn Power." This argument fails for the same reasons discussed above with regard to FEC in Section III.A.1.  *See supra* at 13-15.  Moreover, as NRG Energy points out, Plaintiffs' conclusory allegation—that there was a "*de jure* merger" between GenOn and NRG—is factually incorrect.  The evidence shows that NRG Energy acquired GenOn Energy, Inc. as a subsidiary, which still exists today as a separate entity.  Kranz Decl. at ¶ 8 and Ex. (Corporate Organizational Chart) attached thereto (ECF No. 74-2); NRG Energy's Stmt. of Mat. Undisputed Facts, ¶ 16 (ECF No. 73); GenOn 2012 SEC 10-K Annual Report, Ex. H to Pls.' Resp. (ECF No. 85-8).  As such, GenOn Energy, Inc. was never merged into NRG Energy, and therefore, NRG Energy is not GenOn Energy, Inc.'s successor, but its parent.   Thus, any claims against GenOn Energy, Inc. cannot be attributed to its parent based merely on their parent-subsidiary relationship.  *Bestfoods,* 524 U.S. at 61, 69; *Pearson*, 247 F.3d at 484.

Plaintiffs' second argument is similarly deficient.  Plaintiffs contend that NRG Energy is liable in its own right because Reliant, a direct predecessor of NRG Energy,

directly negotiated and entered into a contract with Canestrale in 2007 that extended the 2002 agreement for the deposit of coal ash from the Elrama Power Plant for an additional three years. Plaintiffs also rely on emails exchanged between employees of Reliant Energy regarding the approval of the contract extension, approvals written on Reliant Energy letterhead, and the naming of Reliant Energy as a party to the agreement. Plaintiffs contend that this evidence creates an issue of fact as to the involvement of Reliant Energy (NRG Energy's predecessor) in the negotiation, direction, authorization, control and oversight of the coal ash disposal. However, Plaintiffs fail to explain how any of this evidence makes NRG Energy the successor to Reliant Energy, and thus liable to Plaintiffs. In addition, Plaintiffs' argument is based on the incorrect factual assertion that Reliant is a direct predecessor of NRG Energy.

It appears that GenOn Energy, Inc., not NRG Energy, is the successor to Reliant Energy. *See* NRG 2010 SEC 10-K Annual Report at 4, Ex. F to Pls.' Resp. (ECF No. 85-6 at 29). GenOn Energy, Inc. is a wholly-owned subsidiary of NRG Energy. It is well settled that a parent corporation cannot be held liable for the actions of its subsidiary. *BestFoods*, 524 U.S. at 61; *Pearson*, 247 F.3d at 484 ("mere ownership of a subsidiary does not justify the imposition of liability on the parent."). As Plaintiffs offer nothing more than mere ownership to ascribe liability to NRG Energy, their argument lacks merit.

Moreover, the evidence here does not establish that NRG Energy owned or operated the Elrama Power Plant. Rather, the evidence shows that Reliant Energy owned and operated the Elrama Power Station from at least 2002 until approximately 2010. *See* LaBelle Landfill and Ash Management Agreement, Ex. J to Pls.' Resp. (ECF

No. 85-10 at 3). After GenOn Energy, Inc. acquired Reliant Energy, GenOn Energy, Inc.'s wholly-owned subsidiary, GenOn Power Midwest LP became the owner and operator of the Elrama Power Plant and was the owner when the merger occurred with Plus Merger Corporation on December 14, 2012. GenOn Power Midwest LP remained the owner until May 28, 2013, at which time it was renamed NRG Power Midwest LP, and NRG Power Midwest LP has owned the Elrama Power Plant since May 28, 2013. Thus, the undisputed evidence clearly shows that NRG Energy never owned or operated the Elrama Power Plant.

Plaintiffs further argue that because NRG Power Midwest LP is not a corporation, NRG Energy is the controlling member of NRG Power Midwest LP, based on the theory that NRG Energy is the party that ultimately controls NRG Power Midwest GP, LLC, which is the sole general partner and the controlling member of NRG Power Midwest LP, and therefore, viewing the facts in the light most favorable to Plaintiffs, NRG Energy should be viewed as controlling NRG Power Midwest LP. As such, Plaintiffs contend that NRG Energy is liable for the debts of NRG Power Midwest LP. In support, Plaintiffs cite *In re Malone,* 74 B.R. 315, 319 (Bankr. E.D. Pa. 1987). The first infirmity with this argument is that it is a legal, not factual, one and therefore it does not raise factual issues. Moreover, even viewing the facts in the light most favorable to Plaintiffs, their argument fails as a matter of law. Plaintiffs' reliance on *In re Malone* is misplaced as it is inapposite here. Although Plaintiffs have provided a pinpoint cite, they do not state the holding or proposition for which they cite that case. It appears the only relevant language on page 319 of that opinion is the following: "As

a rule, general partners are personally liable for partnership debts."  However, that does not help Plaintiffs in this case—assuming, as Plaintiffs contend, that NRG Power Midwest GP, LLC is the sole general partner of NRG Power Midwest LP,[13]that would make NRG Power Midwest GP LLC responsible for NRG Power Midwest LP's debts, but the quoted language from *In re Malone* does not support holding NRG Energy liable for NRG Power Midwest LP's debts.   NRG Energy's mere ownership of GenOn Energy, Inc., a subsidiary, which in turn owns NRG Power Midwest LP, will not impose liability on NRG Energy for the debts of NRG Power Midwest LP.  *Pearson*, 247 F.3d at 484.

Finally, Plaintiffs have failed to produce any evidence, let alone clear and convincing evidence, that NRG Power Midwest LP is the alter ego of NRG Energy. Rather, to show that NRG Energy controls NRG Power Midwest LP such that NRG Power Midwest LP is the alter ego of NRG Energy, Plaintiffs point to:  (1) a statement in the GenOn Energy, Inc. 2012 SEC 10-K Annual Report that "GenOn deactivated the following coal-fired units . . . :  Elrama units 1-3 (290 MW) June 2012 . . . [,]" *see* 2012 SEC 10-K at 92 (ECF No. 85-8 at 96); (2) a note in the GenOn 2012 SEC 10-K indicating that in May 2012, GenOn filed an RMR rate schedule governing Elrama unit 4 with the FERC, *see* 2012 SEC 10-K at 141 (ECF No. 85-8 at 145); (3) the GenOn 2012 SEC 10-K Annual Report shows NRG Energy, Inc. as the parent of GenOn Energy, Inc.; (4) Reliant

---

[13] Plaintiffs have not produced any evidence to show that NRG Power Midwest GP LLC is the sole general partner of NRG Power Midwest LP.  However, there does appear to be some connection between NRG Power Midwest GP LLC and NRG Power Midwest LP, *see* Corporate Organizational Chart, Exhibit to Kranz Decl. (ECF No. 74-2 at 4), but it cannot not be determined from that exhibit what the exact relationship is between those two entities.

negotiated contracts on behalf of Orion Energy Midwest, LP; and (5) GenOn held itself out to the SEC and the public as the owner and operator of the Elrama Power Plant. However, Plaintiffs' proffered evidence does not even come close to showing that NRG Power Midwest LP was the alter ego of NRG Energy. The factors to be considered in determining whether to pierce the corporate veil include undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs, and the use of the corporate form to perpetuate a fraud. *Lumax*, 669 A.2d at 895 (citation and internal quotation marks omitted). Plaintiffs' proffered evidence does not address any of these factors. Therefore, the Court finds that a reasonable jury could not find that NRG Power Midwest LP was "an artifice and a sham to execute illegitimate purposes and [an] abuse of the corporate fiction and immunity that it carries." *Kaplan, 19 F.3d at 1521* (citation and internal quotation marks omitted).

In summary, Plaintiffs' arguments and evidence has failed to establish (1) that NRG Energy is the successor by merger and therefore directly liable to Plaintiffs, (2) that NRG Energy is the owner of the Elrama Power Plant, or (2) any of the factors delineated by the courts as indicative of alter ego, or raise material questions of fact on this issue. Plaintiffs were afforded an opportunity to conduct discovery to obtain information needed to satisfy their burden of proof on whether NRG Energy is a proper party defendant, yet failed to avail themselves of that opportunity. Accordingly, the Court finds that based on the record evidence, no reasonable jury could find that NRG Energy owns and/or operated the Elrama Power Plant, and the Defendant NRG Energy is entitled to summary judgment in its favor as a matter of law.

**C.**     **Leave to Amend the Complaint**

Plaintiffs suggest, in the alternative, that the proper solution would be to allow them to amend their Complaint, leaving FEC and NRG Energy as defendants, and to add as defendants, AE Supply, including several other entities that may be in the process of concluding a recent bankruptcy proceeding, including but not limited to Allegheny Energy Service Co. and FirstEnergy Generation, LLC, NRG Power Midwest, as well as several other entities that are in the process of concluding a bankruptcy proceeding, including GenOn Energy, Inc. Leave to amend will be granted as far as adding new defendants, but any such amendment may not name either FEC or NRC Energy as defendants, for the reasons set forth above.

**IV.**     **CONCLUSION**

For the reasons set forth above, the Court will grant FEC's Motion for Summary Judgment (ECF N. 58), as well as NRG's Motion for Summary Judgment (ECF No. 72). An appropriate order will follow.

Dated: September 7, 2018          BY THE COURT:

_____
LISA PUPO LENIHAN
United States Magistrate Judge

cc:      All Counsel of Record
         *Via CM/ECF Electronic Mail*